1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**
7                        **FOR THE DISTRICT OF ARIZONA**
8
9    Shane Avington,                         No. CV-14-02284-PHX-DLR (BSB)
10                        Petitioner,         **REPORT AND**
                                             **RECOMMENDATION**
11   v.
12   Charles L. Ryan, et al.,
13                        Respondents.
14   _____

15          Petitioner Shane Avington has filed a Petition for Writ of Habeas Corpus pursuant
16   to 28 U.S.C. § 2254, challenging his convictions and sentences in two different cases in
17   Maricopa County Superior Court, CR 2005-121081-001-SE (the Connolly case) and CR
18   2005-034814-001-SE (the Dunbar case).  (Doc. 1.)  The Petition raises five grounds for
19   relief.  (Doc. 1.)  In their answer, Respondents assert that the Petition should be dismissed
20   as untimely under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), which
21   provides the statute of limitations applicable to state prisoners seeking federal habeas
22   corpus relief.  (Doc. 15.)  Alternatively, Respondents argue that federal habeas corpus
23   review of most of Petitioner's claims is procedurally barred.  Petitioner has filed a reply
24   in support of his Petition.  (Doc. 24.)  For the reasons below, the Court finds the Petition
25   untimely, recommends that the Petition be dismissed, and does not consider
26   Respondents' alternative arguments.
27   / / /
28   / / /

I.     **Factual and Procedural Background**

    A.     **CR 2005-121081-001-SE (the Connolly case)**

On July 22, 2005, a Maricopa County Grand Jury returned an indictment charging Petitioner, in relevant part, with aggravated assault against Lottie Connolly, a class four felony, in violation of Ariz. Rev. Stat. § 13-1204.[1]  (Doc. 15, Ex. A, Item 3.)  The State subsequently alleged that Petitioner had six historical felony convictions, and that he committed the charged offense while on release from an offense he committed in the State of Washington.  (Doc. 15, Ex. A, Items 14, 16.)  After Petitioner failed to appear at two pretrial conferences, the trial court issued a bench warrant for his arrest.  (Doc. 15, Ex. A, Items 28, 31; Doc. 15, Ex. B, Items 19, 20, 35, 37.)  On November 2, 2005, Petitioner was arrested in Seattle, Washington.  (Doc. 15, Ex. A, Item 33 at 6.)

On March 2, 2006, the trial court granted Petitioner's motion for change of counsel and appointed the Maricopa County Public Defender's Office to represent him in both the Connolly and the Dunbar cases.  (Doc. 15, Ex. A, Item 56; Doc. 15, Ex. B, Item 46; Ex. D, Item 21.)  On March 24, 2006, the trial court granted Petitioner's motion to proceed pro se and appointed Deputy Public Defender William Peterson to serve as advisory counsel in both cases.  (Doc. 15, Ex. A, Item 50; Ex.B, Item 49.)  On April 10, 2006, Petitioner rescinded his pro se status and asked the court to appoint Peterson as trial counsel in the Connolly case only.  (Doc. 15, Ex. B, Item 77; Doc. 15, Ex. J, TR 4/10/06 at 44-51.)

      **1.     Evidence Presented at the Connolly Trial**

On May 8, 2005, Petitioner lived at 1855 East Don Carlos, Tempe, Arizona, in apartment number 217, with Lottie Connolly and her three minor children.  (Doc. 15, Ex. L; TR 4/12/06 at 51, 70-71, 76, 87-89, 98-100.)  At the time of the incident giving rise to Petitioner's challenged conviction, Jesse Bramley lived next door to Petitioner and John Dunbar lived in apartment below Petitioner's apartment.  (*Id.* at 40-41, 51, 54-55,

---

[1] The aggravated assault charge was originally Count Three of a six-count indictment.  (Doc. 15, Ex. A, Item 3.)  The State dismissed the five other counts without prejudice.  (Doc. 15, Ex. A, Item 74; Ex. B, Item 76; Ex. BB, TR 6/15/06 at 5.)

57, 64, 70, 91-92.)  The day of the incident, Dunbar and Bramley overheard Petitioner and Connolly fighting, starting around 7:00 a.m. or 8:00 a.m.  (*Id.* at 40-44, 51-54.)  At approximately 11:00 a.m., Dunbar noticed that the arguing was louder.  (*Id.* at 54.)  Dunbar later heard the door to Petitioner's apartment slam, heard Petitioner descend the stairs, and saw Petitioner walk past his living room window.  (*Id.* at 54.)  Dunbar also heard Connolly yell at Petitioner through an open window.  (*Id.* at 54-56.)

Dunbar observed Petitioner turned around, run past Dunbar's window, climb the stairs, and forcefully enter his apartment.  (*Id.* at 55-57, 62.)  Both Dunbar and Bramley then overheard a loud banging noise, followed by the sounds of Connolly screaming.  (*Id.* at 43-45, 55.)  Dunbar then observed Petitioner run down the stairs past his living room window, and saw him jump over the wall surrounding the apartment complex.  (*Id.* at 57-58, 63.)  Dunbar and Bramley testified that the only adult voices that they had heard during this confrontation belonged to Petitioner and Connolly.  (*Id.* at 41-43, 59.)

In response to a 911 call, Tempe Police Officers Natasha Hampton and John Rogers responded to the apartment complex at approximately 12:45 p.m.  (*Id.* at 57, 69-70, 86-87.)  The officers discovered a trail of blood leading from the parking lot to the front door of Petitioner's and Connolly's apartment.  (*Id.* at 70, 84-85, 90-92.)  When she entered the apartment, Detective Hampton followed the blood and the sound of crying to the master bedroom, where she found Connolly.  (*Id.* at 71-72, 87-89, 92-95.)  Hampton took photographs of Connolly's injuries.  (Doc. 15, Ex. L, TR 4/12/06 at 72-75, 81, 129-32; (State's Trial Exs. 1, 2, 3, 4, 6-8, 10.)  Petitioner did not return home while the police were at his apartment.  (Doc. 15, Ex. L, TR 4/12/06 at 45-46, 58, 63-64, 69-71, 81, 87-88.)  Connolly was taken to the hospital emergency room.  (*Id.* at 81, 126.)  Connolly told a physician assistant, Alejandro Figueroa, that "she was punched and kicked in the face, chest, and head."  (*Id.* at 126-28.)

## 2.    Jury Verdict and Sentence

On April 13, 2006, the jury found Petitioner guilty of aggravated assault as charged.  (Doc. 15, Ex. M, TR 4/13/06 at 41-47.)  After an evidentiary hearing, the trial

court found that Petitioner had three historical felony convictions and also found two aggravating circumstances.  (Doc. 15, Ex. B, Items 101, 107; Ex. BB, TR 6/15/06 at 8-9.) The trial court sentenced Petitioner to an aggravated term of fifteen-years' imprisonment. (Doc. 15, Ex. B, Item 107; Doc. 15, Ex. BB, TR 6/15/06 at 39-49.)

### 3.    Direct Review

On July 5, 2006, Petitioner filed a timely notice of appeal in the Arizona Court of Appeals.  (Doc. 15, Ex. A, Item 83.)  On May 16, 2007, Petitioner's counsel filed an opening brief that presented the following arguments: (1) whether "the trial court err[ed] by using the fact of physical injury as an aggravating factor when it was also an element of the crime, resulting in an illegal sentence and a violation of due process[]"; (2) whether fundamental error occurred because there was insufficient evidence to support Petitioner's conviction for aggravated assault; (3) whether Petitioner's Sixth Amendment right to confrontation was violated when Connolly did not testify, but the trial court permitted the admission of her statement "made to a physician's assistant in the presence of a police officer"; and (4) whether the trial court erred by considering [Petitioner's] Washington conviction for theft in the second degree a prior conviction for purposes of sentencing enhancement.  (Doc. 15, Ex. O at 6-7.)  On December 20, 2007, the appellate court affirmed Petitioner's conviction and sentence.  (Doc. 15, Ex. R.)

On January 22, 2008, Petitioner, through counsel, filed a petition for review in the Arizona Supreme Court.  (Doc. 15, Ex. S.)  On June 3, 2008, the Arizona Supreme Court summarily denied review.  (Doc. 15, Ex. T.)  Petitioner did not seek further review.

### B.    CR 2005-034814-001 SE (the Dunbar case)

On November 15, 2005, the State charged Petitioner with aggravated assault against John Dunbar, a class four felony (the Dunbar case).  (Doc. 15, Ex. C, Item 1.) The State later alleged that Petitioner committed the offense while released on bail in the Connolly case, and that Petitioner had several prior felony convictions from Washington State.  (Doc. 15, Ex. C, Items 7, 8.)  The State also alleged several aggravating

circumstances, including the infliction of serious physical injury, the presence of an accomplice, and emotional and financial harm to the victim. (Doc. 15, Ex. C, Item 10.)

On February 13, 2006, Petitioner filed a motion for change of counsel, in which he requested "any other attorney." (Doc. 15, Ex. C, Item 17.) As previously noted, on March 2, 2006, the trial court granted this motion and appointed the Maricopa County Public Defender's Office to represent Petitioner in both the Connolly and the Dunbar cases. (Doc. 15, Ex. D, Item 21.) On March 24, 2006, the trial court granted Petitioner's motion to proceed pro se and appointed Deputy Public Defender William Peterson to serve as advisory counsel in both cases. (Doc. 15, Ex. D, Item 23; Doc. 15, Ex. A, Item 50.) Although Peterson represented Petitioner at trial in the Connolly case, Petitioner acted as his own attorney during the rest of the proceedings in the Dunbar case. (Doc. 15, Ex. D, Items 24, 26, 29, 31, 33, 35, 37, 38, 39, 41, 42, 48, 54, 62, 67, 74, 77, 81.)

### 1.    Evidence Presented at the Dunbar Trial

The evidence at trial indicated that, at the time of the incident, Petitioner lived with Connolly and her three children in apartment 217 at an apartment complex in Tempe, Arizona. (Doc. 15, Ex. V, TR 5/3/06 at 56-58, 72, 109-10, 118, 121, 123-24, 127-28; Ex. W, TR 5/4/06 at 29-30, 36, 41, 61, 98-99.) At that time, Dunbar and his wife, Sheri Oclassen, lived in the apartment below Petitioner's apartment. (Doc. 15, Ex. V, TR. 5/3/06 at 58, 123-24; Ex. W, TR 5/4/06 at 36, 41, 61.) Jesse Bramley and his wife lived next door to Petitioner. (Doc. 15, Ex. V, TR 5/3/06 at 56-58, 72, 80.)

Bramley testified that he had a few conversations with Petitioner and that he saw him "often," such as when Petitioner was "either going up to [his] apartment, going down to his vehicle, walking around the grounds of the apartments, [or] talking in the back." (Doc. 15, Ex. V at 72-74, 106.) Oclassen was never formally introduced to Petitioner, but she saw him "many times" as he was "coming and going" on the complex's common grounds. (*Id.* at 127; Doc. 15, Ex. W, TR 5/4/06 at 29.) Oclassen knew that Petitioner and Connolly lived in an apartment upstairs, she heard other people call Petitioner

"Shane," and recognized Petitioner as Connolly's boyfriend.  (Exhibit V, TR 5/3/06 at 127-28; Exh. W, TR 5/4/06 at 29-30.)

Dunbar testified that he frequently saw Petitioner in the public areas of the apartment complex and had several conversations with him before the incident.  (Doc. 15, Ex. W, TR 5/4/06 at 61-62, 74-75, 83-84.)  Dunbar also saw Petitioner with Connolly inside apartment 217 because he went upstairs "many times" to complain about the noise they made when they were fighting.  (*Id.* at 76-77.)

At approximately 9:30 p.m. the night of the alleged incident, Connolly went downstairs to the electric power box mounted near Dunbar's and Oclassen's apartment and repeatedly struck the box and lock with a hammer.  (*Id.* at 36-40, 78-80, 112; Doc. 15, Ex. V, TR 5/3/06 at 56-57, 124-25; Ex. X, TR 5/8/06 at 66, 75-76.)  Bramley heard "a loud banging noise outside [his] second bedroom window." (Doc. 15, Ex. V, TR 5/3/06 at 56, 86.)  Dunbar and his wife heard loud thuds and noticed that their lights flickered after each banging noise.  (*Id.* at 124; Doc. 15, Ex. W, TR 5/4/06 at 36-38, 78.)

Dunbar went outside and saw Connolly hitting the electrical power box with a hammer.  (Doc. 15, Ex. W, TR 5/4/06 at 40-41.)  Dunbar yelled at Connolly.  (*Id.* at 42, 79.)  Connolly turned around, cursed at Dunbar, and swung the hammer at him.  (*Id.* at 42, 80; Ex. V, TR 5/3/06, at 56-57.)  Bramley went outside on the balcony of his apartment and saw Connolly emerging from the bushes near the power box, yelling at Dunbar, and swinging her arms at Dunbar, who was retreating and trying to block Connolly from hitting him.  (*Id.* at 57-59.)

As he backed away from Connolly, Dunbar noticed Petitioner approaching from his left side.  (Doc. 15, Ex. W, TR 5/4/06 at 43-44, 80.)  Petitioner hit Dunbar on the left side of his head behind the ear.  (Doc. 15, Ex. V, TR 5/3/06 at 59; Ex. W, TR 5/4/06 at 45, 83.)  Petitioner then "rained punches down" on Dunbar's head with his right fist, which made Dunbar start "blacking out."  (Doc. 15, Ex. V, TR 5/3/06 at 60; Ex. W, TR 5/4/06 at 45-46.)

1    While standing on the upstairs balcony, Bramley watched as Petitioner "punched

2  [Dunbar] in the head, and took two steps back, and then punched him again, and then

3  again, and then again," approximately five or six times total.  (Doc. 15, Ex. V, TR 5/3/06

4  at 59-60, 110.)  After punching Dunbar repeatedly in the head, Petitioner put Dunbar in a

5  headlock and hit him in the head.  (*Id.* at 60-61; Ex. W, TR 5/4/06 at 46-48.)  At the time

6  of the incident, Petitioner was wearing a white tank-top shirt and Dunbar saw tattoos on

7  his arms.  (Doc. 15, Ex. W, TR 5/4/06 at 46, 94; Ex. X, TR 5/8/06 at 74.)  Bramley saw

8  Petitioner drag Dunbar into the covered parking area between two cars, pin Dunbar to the

9  pavement, and hit him in the head five or six more times.  (Doc. 15, Ex. V, TR 5/3/06 at

10  60-62.)  Dunbar became unconscious for a few seconds.  (Doc. 15, Ex. W, TR 5/4/06 at

11  49-50.)

12    Bramley testified that Petitioner kicked Dunbar in the left temple and then started

13  walking away.  (Doc. 15, Ex. V, TR 5/3/06 at 62.)  When he was "about five paces

14  away," Petitioner "turned around, came back and stomped on Dunbar's head with his

15  heel four times."  (*Id.* at 62-63.)  Bramley testified that Petitioner "came back over and he

16  stood by Dunbar's head, raised his knee up probably as high as he could probably get it.

17  I'd say he got his . . . knee up about mid-waist and proceeded to bring . . . the bottom of

18  his foot down, the bottom of his foot down forcibly with all his force . . . on [Dunbar's]

19  head."  (*Id.* at 64-66.)  Then, about four times, Petitioner walked about six feet away and

20  come back and stomped on Dunbar's head several times on each return visit.  (*Id.*)  Then,

21  Petitioner walked away again, returned, and kicked Dunbar in the face "like [he was]

22  planning to kick a football, you know, punt a field goal, kick a soccer ball far."  (*Id.*)

23  Bramley testified that all of Petitioner's kicks landed on Dunbar's head, and that the only

24  other person nearby was Connolly, who "egg[ed] [Petitioner] on."  (*Id.* at 66.)

25    Dunbar testified that Petitioner's repeated kicks to his head brought him back to

26  consciousness.  (Doc. 15, Ex. W, TR 5/4/06 at 50-51.)  Dunbar described Petitioner's

27  kicking as "a mixture of trying to kick a field goal . . . with the leg swinging back and

28  down and stomps down" to his head.  (*Id.* at 52.)  Dunbar testified that he lapsed in and

out of consciousness, but remembered Petitioner kicking him in the head several times during a short interval.  (*Id.* at 53-55.)

During the incident Bramley yelled at Petitioner to stop.   (Doc. 15, Ex. V, TR 5/3/06, at 66-67, 111.)  Oclassen heard Petitioner and Bramley shouting at each other and went to a lit area outside her apartment's front door.  She saw Dunbar "lying on the parking lot floor, curled up in the fetal position on his left side," and Petitioner standing behind Dunbar "near his head."  (*Id.* at 125-26.)  Oclassen then saw Petitioner "jump up and come down on one foot with the other foot impacting on Dunbar's head."  (*Id.* at 126.)  Oclassen was standing "eight to ten feet" away when Petitioner "lifted [his body] anywhere from a foot to a foot and a half off the ground" and then stomped on Dunbar's head with his right foot.  (*Id.* at 129.)

After the last kick, Petitioner fled the parking lot, ran by Oclassen, and jumped the apartment complex's fence.  (*Id.* at 67, 115, 126, 130; Ex.W, TR 5/4/06 at 16, 55-56.)  Oclassen was certain that Petitioner was the person she saw hitting Dunbar because the incident took place a few feet away from her in an illuminated area, and the corridor down which Petitioner ran past her was illuminated.  (Doc. 15, Ex. V, TR 5/3/06 at 129; Ex. W, TR 5/4/06 at 22, 30.)

When Dunbar saw Petitioner run down the corridor towards Oclassen, he shouted for her to go inside.  (Doc. 15, Ex. W, TR 5/4/06 at 55-56.)  Oclassen called the police.  (Doc. 15, Ex. V, TR 5/3/06 at 111-12, 119, 130-31.)   After waiting a few minutes to make sure that Petitioner had not returned, Bramley went downstairs to the parking lot.  (*Id.* at 67, 80, 82, 103, 111.)  Bramley found Dunbar on the pavement, badly beaten, but trying to stand.  (*Id.* at 67, 113-14, 119-20.)  Bramley noticed blood and a pair of broken eyeglasses that Petitioner had been wearing.  (*Id.* at 68-71, 113-14.)

By the time the police arrived, Dunbar had returned to his apartment.  (*Id.* at 114, 121, 130-31; Ex. W, R.T. 5/4/06 at 56-57.)   Bramley took the police officers to Connolly's and Petitioner's apartment.  (Doc. 15, Ex. V, TR 5/3/06, at 116, 118, 121.)  Connolly did not open the door.  (*Id.* at 118, 121.)

Bramley testified that he was "100-percent certain" that Petitioner was the person whom he saw hitting Dunbar in the parking lot. (*Id.* at 83.) Bramley explained that "[Petitioner's] hair, [his] height, [his] facial features [were] all visible by the streetlights that were down there . . . coming from the covered parking, the light post that was right near you guys during the incident." (*Id.* at 103-04.) Bramley explained that this lighting gave him "a clear view of [Petitioner's] facial features, [his] build, and [his] voice when [Petitioner] called up to him." (*Id.* at 104.) Tempe Police Officer Rainey, who viewed the crime scene that night, corroborated Bramley's assertions that the location of the incident was illuminated, and that the lighting was "sufficient that someone could positively identify [another] person there." (Doc. 15, Ex. W, TR 5/4/06, at 116.)

During an interview with Officer Benker the night of the incident, Bramley identified Dunbar's assailant as "Connolly's boyfriend," but he could not identify Petitioner by name because he could not recall it because he was "shaken from the witnessing of something this brutal." (Doc. 15, Ex. V, TR 5/3/06, at 76-78, 80, 82, 106-09.) Bramley told police Petitioner was Connolly's boyfriend, he lived in the next door apartment with Connolly, he was a dark skinned African-American man, and at the time of the incident, Petitioner was wearing a white tank-top shirt, blue shorts, and white tennis shoes. (*Id.* at 107; Ex. X, TR 5/8/06 at 74, 77-79.)

When Officer Benker entered Dunbar's apartment, he found him on the living room couch badly beaten. He was bleeding from the head and lapsing in and out of consciousness. (Doc. 15, Exh. X, TR 5/8/06 at 68.) The severity of Dunbar's injuries prevented Benker from questioning him extensively. (*Id.* at 69, 77.) At trial, the State offered in evidence several photographs depicting Dunbar's injuries that were taken when he was at the hospital. (Doc. 15, Ex. V, TR 5/3/06 at 132-37.)

Dunbar told Officer Benker that when he went outside his apartment to investigate the flickering of his apartment's interior lights, he saw Connolly hitting the power box. Connolly tried to hit him, and "a large black male" intervened and punched Dunbar in the head repeatedly. (Doc. 15, Ex. X, TR 5/8/06, at 70-71.) On cross-examination, Dunbar

explained that he did not tell Officer Benker Petitioner's name because he was in a lot of pain, and he only knew Petitioner's first name from overhearing other people calling him Shane.  (Doc. 15, Ex. V, TR 5/3/06 at 131; Ex. W, TR 5/4/06 at 60, 85-86.)  Dunbar later identified Petitioner as his assailant from a photographic lineup that Detective Adams showed him.  Dunbar told Detective Adams, "I knew him by Shane," and that Petitioner lived upstairs with his girlfriend.  (Doc. 15, Ex. W, TR 5/4/06 at 86-87.)  At trial, Dunbar identified Petitioner as his assailant.  (*Id.* at 43-45.)

On the night of the incident, Oclassen did not identify Petitioner to the police by his name.  (Doc. 15, Ex. V, TR 5/3/06 at 141.)  Oclassen explained that she did not mention Petitioner's name to the police at that time because she was concerned about Dunbar's injuries, the police did not ask her to give Petitioner's name, and she had never been introduced to Petitioner.  (Doc. 15, Ex. V, TR 5/3/06 at 141-42.)  Later, when police showed Oclassen a photographic lineup containing Petitioner's picture, Oclassen selected Petitioner's picture.  (Doc. 15, Ex. V, TR 5/3/06 at 142.)  At trial, Oclassen identified Petitioner as Dunbar's attacker.  (*Id.* at 126-27, 129-30, 137; Doc. 15, Ex. W, TR 5/4/06 at 22, 30.)

Tempe Police Officers Rainey and Benker testified that they saw Connolly in the parking lot shortly after they arrived on the scene.  (Doc. 15, Ex. W, TR 5/4/06 at 98-100, 104, 110; Ex. X, TR 5/8/06 at 62-65.)  Connolly claimed that Dunbar had assaulted her, showed the officers marks on her back and elbow, and alleged that she had sustained these injuries during the altercation that ensued when Dunbar interrupted her efforts to open the locked power box with a hammer.  (Doc. 15, Ex. W, TR 5/4/06 at 104-05, 114; Ex. X, TR 5/8/06 at 66.)

During her discussion with police, Connolly initially refused to identity Dunbar's assailant.  (Doc. 15, Ex. W, TR 5/4/06 at 115.)  Connolly eventually told the officers that her "boyfriend" had beaten Dunbar.  (*Id.* at 113-15.)  Connolly told the officers that her boyfriend was "a Hispanic male" named "Tony."  (*Id.* at 105-06, 110, 113-15.)  Connolly refused to tell the officers "Tony's" last name, address, or where he was hiding.  (*Id.* at

106, 110, 114.)  Before leaving her apartment, the officers told Connolly that they needed to talk with her boyfriend, but they never heard from "Tony" before Petitioner's trial. (*Id.* at 113.)

During trial, Petitioner offered Connolly's out-of-court statements identifying Dunbar's assailant as her Hispanic boyfriend, "Tony."  (Doc. 15, Ex. W, TR 5/4/06 at 105-06, 113-15.)   Petitioner also presented the testimony of his friend and alleged fiancée, Gina Boone.  (Doc. 15, Ex. X, TR 5/8/06 at 16-17, 27-28.)  Boone testified that Petitioner arrived at her residence in Firebaugh, California, on September 1, 2005, and that he stayed with her until mid-October 2005.  (*Id.* at 17-18, 21, 23, 25, 47-49.)  Boone testified that she had not seen Petitioner for five years before he arrived, but they resumed a romantic relationship and got engaged on September 15, 2005, the day of the charged assault.  (*Id.* at 17-18, 21, 28-29.)  Boone testified that she and Petitioner stayed at her house for most of their time together, and that Petitioner did not take an overnight trip to Arizona.  (*Id.* at 21, 20.)  Boone testified that Petitioner never had any tattoos on his neck or arms.  (*Id.* at 45-46.)

On cross-examination, Boone testified that Petitioner proposed to her after spending less than two weeks with her and following an absence of more than five years. (Doc. 15, Ex. X, TR 5/8/06 at 25, 28-30.)  Boone admitted that she was not wearing an engagement ring in the courtroom, but claimed that she had "forgotten" it at her kitchen sink.  (*Id.* at 29.)   Boone did not have any receipts for expenditures she made during Petitioner's alleged stay in California.  (*Id.* at 36-37.)  Boone admitted that she did not call the police before trial to tell them that Petitioner had been with her on the date of the incident.  (*Id.* at 37-38.)  She also admitted that she had a conviction for misdemeanor theft.  (*Id.* at 39.)

### 2.      Verdict and Sentence

Following a trial, the jury found Petitioner guilty as charged.  (Doc. 15, Ex. Z, TR 5/10/06, at 14-15.)  After an evidentiary hearing, the court found that Petitioner had three historical felony convictions and two aggravating factors.   The court imposed an

aggravated prison term of fifteen-years' imprisonment, to run consecutive to Petitioner's sentence in the Connolly case.[2]  (Doc. 15, Ex. AA, TR 5/19/06 at 4-21; Ex. BB, TR 6/15/06 at 11-12, 39-50.)

### 3.   Direct Review

On July 5, 2006, Petitioner filed a timely notice of appeal in the Dunbar case. (Doc. 15, Ex. C, Item 83.)  On July 11, 2007, Petitioner's counsel filed an opening brief raising the following issues: (1) whether "the trial court erred by using the fact of physical injury as an aggravating factor when it was also an element of the crime, resulting in an illegal sentence and a violation of due process"; (2) whether the court abused its discretion by allowing "the state to introduce a photo showing [Petitioner's] tattoos without establishing that the photo showed the presence of the tattoos at the time of the crime"; (3) whether the trial court erred by denying Petitioner's request to instruct the jury that "the state must prove beyond a reasonable doubt that [Petitioner] was the person who committed the crime"; (4) whether "the trial court improperly considered [Petitioner's] Washington conviction for Theft in the Second Degree as a prior felony conviction for purposes of sentence enhancement"; and (5) whether the trial court erred by failing to sua sponte instruct the jury "on the alibi defense."  (Doc. 15, Ex. CC at 9-10.)

On March 20, 2008, the appellate court affirmed Petitioner's convictions and sentences.  (Doc. 15, Ex. FF.)  Petitioner did not seek review in the Arizona Supreme Court.  The Arizona Court of Appeals issued its mandate on June 9, 2008.  (Doc. 15, Ex. C, Item 116.)

### C.   First Consolidated Post-Conviction Proceeding

On June 27, 2008, in the Dunbar case, Petitioner submitted a notice of post-conviction relief, pursuant to Rule 32 of Arizona Rules of Criminal Procedure, to prison officials for mailing.  (Doc. 15, Ex. C, Item 117.)  The notice was filed with the trial court

---

[2]   The trial court consolidated the sentencing proceedings for the Connolly and Dunbar cases.  (Doc. 15, Ex. Z, TR 5/10/2006; Doc. 15, Ex. BB, TR 6/15/2006.)

on June 30, 2008.  (*Id.*)  On July 7, 2008, the trial court appointed Kenneth Countryman to represent Petitioner.  (Doc. 15, Ex. D, Item 118.)

On July 11, 2008, Petitioner submitted a Rule 32 notice of post-conviction relief in the Connolly case to prison officials for mailing, which the state court filed on July 14, 2008. (Doc. 15, Ex. A, Item 123.)   The trial court initially appointed the Maricopa County Public Defender's Office to represent Petitioner in the Connolly case.  (Doc. 15, Ex. A, Item 143.)  However, the case was reassigned to Countryman on August 28, 2008. (Doc. 15, Ex. B, Items 142, 144.)

On January 6, 2010, Petitioner, through counsel, filed a consolidated petition for post-conviction relief raising four claims.  In his first claim, Petitioner asserted that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), because the prosecutor: (a) did not inform Petitioner before the trial in the Connolly case that Connolly had recanted her statements to the physician assistant that Petitioner was her assailant; (b) falsely reported that Connolly did not want to be interviewed by the defense; and (c) did not disclose that Connolly would have testified in support of Petitioner's alibi and misidentification defenses in the Dunbar case.

In his second claim, Petitioner asserted that the prosecutor engaged in prosecutorial misconduct by failing "to disclose [Connolly's] recanted testimony and facts on both cases," pursuant to Rules 15.1(b) and (c)(2) of the Arizona Rules of Criminal Procedure, and by threatening to prosecute Connolly if she appeared at Petitioner's two trials and testified that he did not commit either charged assault.  In his third claim, Petitioner asserted that the trial judge was biased against Petitioner, as evidenced by the imposition of consecutive aggravated prison sentences, a "clear personality" conflict, and "numerous [unspecified] run ins" during "the course of two trials."

In his fourth claim, Petitioner asserted that trial counsel in the Connolly case was ineffective because: (a) he "did not request an interview of Lottie Connolly" before trial, (b) he "failed to conduct any investigation into the whereabouts of Ms. Connolly or

determine that she had recanted her testimony regarding the incident" before trial, (c) he "did not investigate the second incident involving Jonathan Dunbar and determine that Ms. Connolly supported [Petitioner's] alibi[;] and (d) he "failed to do any investigation or motion work to preclude the introduction of statements by physician assistant Figueroa." (Doc. 15, Ex. A, Item 150 at 7-13 and attachments; Ex. C, Item 124 at 7-13 and attachments.)

Petitioner attached several exhibits to his petition, including: (1) Connolly's affidavit, which was notarized and sworn on March 23, 2009; (2) assorted court documents indicating that Dunbar obtained an order of protection against Connolly in September 2005; (3) copies of several letters that the Maricopa County Attorney's Office and the Arizona Attorney General had sent Connolly regarding her rights as a crime victim; and (4) a copy of a degree Petitioner earned while in prison.  (Doc. 15, Ex. A, Item 150, Attachments; Ex. C, Item 124, Attachments.)

In its response, the State argued that the court should deny post-conviction relief because: (1) the prosecutorial-misconduct and *Brady* claims were precluded by Arizona Rule of Criminal Procedure 32.2(a)(3) because Petitioner failed to raise these claims at trial or on direct appeal; (2) alternatively, the prosecutorial-misconduct and *Brady* claims lacked merit; (3) Petitioner's claim of judicial bias or disproportionate sentence lacked merit; and (4) Petitioner's claims that counsel was ineffective in the Connolly case lacked merit.  (Doc. 15, Ex. A, Item 156; Ex. C, Item 132, at 6-23.)

In his reply, Petitioner argued that his prosecutorial misconduct claim was not precluded, and that the information that Connolly provided in her affidavit constituted new evidence that entitled him to an evidentiary hearing.  (Doc. 15, Ex. C, Item 140.)

On November 1, 2010, the trial court issued an order stating that:

On January 6, 2010, Defendant filed a Consolidated Petition for Post-Conviction Relief; on March 15, 2010, the State filed a response addressing Defendant's contentions; and on May 19, 2010, Defendant filed a Reply. This Court has reviewed Defendant's Petition, the State's Response, and Defendant's Reply, and finds the State's arguments well taken.

1
2
3

IT IS THEREFORE ORDERED denying the Petition for Post-Conviction Relief, dismissing the Notice of Post-Conviction Relief, and dismissing the post-conviction relief proceedings in Cause Number CR 2005-034814 and Cause Number CR 2005-121081.

4

(Doc. 15, Ex. B, Item 164; Ex. D, Item 142.)

5
6
7
8
9
10

On January 14, 2011, Petitioner filed a petition for review with the Arizona Court of Appeals arguing that he was "entitled to post-conviction relief because (1) he did not receive . . . effective assistance of counsel; (2) there was prosecutorial misconduct; (3) [there were] violations of *Brady v. Maryland*; and (4) [he] received a disproportionate sentence based upon the personal bias of the trial judge." (Doc. 15, Ex. GG at 1.) On December 4, 2012, the appellate court summarily denied review. (Doc. 15, Ex. KK.)

11
12
13

Proceeding pro se, Petitioner timely petitioned the Arizona Supreme Court for review of the denial of post-conviction relief. (Doc. 15, Ex. LL, Ex. MM.) On April 29, 2013, the Arizona Supreme Court summarily denied review. (Doc. 15, Ex. OO.)

14
15
16

On July 26, 2013, Petitioner filed a petition for writ of certiorari with the United States Supreme Court. (Doc. 15, Ex. QQ.) On October 15, 2013, the Supreme Court denied the petition. (Exhibit QQ.)

17

**D.    Second Consolidated Post-Conviction Proceeding**

18
19
20

On May 23, 2014, Petitioner, through counsel, filed petitions for post-conviction relief in the Connolly and Dunbar cases.[3] (Doc. 15, Exs. RR, SS.) The petitions were nearly identical and sought re-sentencing based upon the newly discovered evidence of

21

─────────────────────

22
23
24
25
26
27

[3]   The record does not contain any evidence of Petitioner filing notices of post-conviction relief before filing the petitions. *See Isley v. Ariz. Dep't of Corrs.*, 383 F.3d 1054, 1055-56 (9th Cir. 2004) (stating that in Arizona, a state post-conviction proceeding is commenced when the petitioner files the notice in accordance with Rule 32.4(a)). In its July 18, 2014 order denying post-conviction relief, the trial court stated that the petitions were filed on May 23, 2014 and "are both untimely and successive" under Rule 32.4(a) of the Arizona Rules of Criminal Procedure. (Doc. 15, Ex. TT at 2); *See* Ariz. R. Crim. P. 32.4(a) (providing the deadlines for filing a notice of post-conviction relief). The Court has reviewed the docket in CR2005-034814 and CR2005-121081. There is no evidence that Petitioner filed notices of post-conviction relief in accordance with Rule 32.4(a) before filing his petitions.

28

Based on the state court's July 18, 2014 order, the Court finds that the second post-conviction proceeding was commenced on May 23, 2014 when he filed his petitions.

Petitioner's recent diagnosis of Post-Traumatic Stress Disorder (PTSD).  (*Id.*)  Petitioner requested to consolidate the post-conviction proceedings.  (*Id.*)

On July 14, 2014, the trial court consolidated the post-conviction petitions, and denied relief.  (Doc. 15, Ex. TT.)  The trial court explained that:

> Now on May 23, 2014, Defendant has filed his second Petition for Post-Conviction Relief, and has filed [a] Motion to Consolidate Rule 32 Petitions.  Defendant claims, pursuant to Ariz. R. Crim. P. 32.1(e), that there are newly discovered material facts that probably would have changed the verdict or the sentence in his case.  This Court concludes that these petitions are both untimely and successive.
>
> To be entitled to post-conviction relief on newly discovered evidence, the defendant must show the following: (1) the evidence appears on its face to have existed at the time of trial, but was discovered after trial, (2) the defendant shows diligence in discovering the evidence and bringing it to the trial court's attention, (3) the evidence must not be merely cumulative or impeaching, (4) the evidence must be relevant to the case, and (5) the evidence must be such that it probably would have altered the verdict, finding, or sentence if known at the time of the trial . . . .  Under this standard, Defendant fails to support this claim.  Defendant states that he has been diagnosed with PTSD, but fails to provide any facts, affidavits, records, or other evidence to support why these facts could not have been produced at the trial phase through reasonable diligence.
>
> A defendant must comply strictly with Rule 32 by asserting substantive grounds that bring him within the provisions of the Rule in order for the Court to grant relief . . . .  Defendant fails to state a claim for which relief can be granted in an untimely Rule 32 proceeding.  Rule 32.4(a).
>
> IT IS THEREFORE ORDERED dismissing Defendant's Petition for Post-Conviction Relief.

(*Id.* at 2.)

On July 28, 2014, Petitioner filed a motion for reconsideration in the trial court.  (Doc. 15, Ex. UU.)  On October 24, 2014, the trial court denied the motion.  (Doc. 15, Exhibit VV.)

On November 14, 2014, Petitioner filed a petition for review with the Arizona Court of Appeals challenging the denial of post-conviction relief.  (Doc. 15, Exs. WW, XX.)  Upon review of the Arizona Court of Appeals docket in 1 CA-CR 14-0775-PRPC, the appellate court has not ruled on this petition as of the date of this Report and Recommendation.

1

### E.    The § 2254 Petition

2     On October 9, 2014, Petitioner submitted the pending petition for writ of habeas

3 corpus to prison officials for mailing.[4] (Doc. 1.)   The Petition raises five grounds for

4 relief.   In Ground One, Petitioner asserts that trial counsel in the Connolly case was

5 ineffective because: (a) he did not "receive full discovery of what the prosecution ha[d],"

6 and "not just what the State believe[d] they must hand over" (Ground One (a)); (b) he did

7 not "meet with the prosecutor and go over all evidence, good and bad, in the case"

8 (Ground One (b)); (c) he did not "do depositions with all parties concern[ed]" (Ground

9 One (c)); (d) he did not "locate all witnesses, State or independent" (Ground One (d));

10 (e) he did not "do an interview with each and every party" (Ground One (e)); and (f) he

11 did not meet with Petitioner before trial (Ground One (f)).  (Doc. 1 at 18-19.)

12     In Ground Two, Petitioner asserts that the prosecutor in the Dunbar case engaged

13 in prosecutorial misconduct because: (a) "the State failed to disclose that Ms. Connolly

14 has recanted her testimony" (Ground Two (a)); (b) the State did not advise Connolly

15 before trial of "her rights to be interviewed or not by the defense in this case" (Ground

16 Two (b)); and (c) the State "threatened Ms. Connolly if she appeared and testified at this

17 trial with prosecution," purportedly because she "told [the State] the actual facts of the

18 case" and thereby recanted or disavowed the statements that she had made to Physician

19 Assistant Figueroa about the cause of her injuries (Ground Two (c)).  (*Id.* at 19-21.)

20     In Ground Three, Petitioner asserts that the State violated its disclosure obligations

21 under Arizona Rule of Criminal Procedure 15.1 and *Brady v. Maryland*, 373 U.S. 83

22 (1963), by: (a) not informing the defense that Connolly had "recanted her testimony" —

23

---

24     [4]  To determine the filing dates of the Petition and state court filings that Petitioner
filed when he was not represented by counsel, Respondents used the date on which
25 Petitioner delivered the document to prison officials for mailing.  Respondents consider
that date to be the date the handwritten "certificate of mailing."  (Doc. 15 at 37 n.13.)  *See*
26 *Houston v. Lack*, 487 U.S. 266, 270-71 (1988) (a legal document is deemed filed on the
date a petitioner delivers it to the prison authorities for filing by mail); *Hernandez v.*
27 *Spearman*, 764 F.3d 1071, 1074 (9th Cir. 2014) (recognizing the inapplicability of the
mailbox rule when state prisoner is assisted by counsel) (citing *Stillman v. LaMarque*,
28 319 F.3d 1199, 1202 (9th Cir. 2003)).  The Court also uses the mailbox rule to determine
the filing dates of documents Petitioner filed without the assistance of counsel.

her statements to Physician Assistant Figueroa (Ground Three (a)); and (b) not disclosing "over 650 pages of documents to the defense (Chapman case)" (Ground Three (b)).[5]  (*Id.* at 21-24.)   In Ground Four, Petitioner asserts that he "received a disproportionate sentence based upon the personal bias of the trial judge." (*Id.* at 24-27.)  In Ground Five, Petitioner asserts that the trial court erred in the Dunbar case by not sua sponte instructing the jury on Petitioner's alibi defense. (*Id.* at 27-28.)

In their answer, Respondents assert that the Petition is untimely under the applicable statute of limitations, and that federal habeas review of most aspects of Grounds One through Five is procedurally barred. (Doc. 15.)  Petitioner has filed a reply in support of his Petition.  (Doc. 24.)  As discussed below, the Court finds the Petition untimely.

## II.      Statute of Limitations

### A.      Commencement of the Limitations Period

The AEDPA provides a one-year statute of limitations for state prisoners to file petitions for writ of habeas corpus in federal court.  28 U.S.C. § 2244(d)(1).  "Section 2244(d)(1) 'contain[s] multiple provisions relating to the events that trigger its running.'" *Lee v. Lampert*, 653 F.3d 929, 933 (9th Cir. 2011) (en banc) (quoting *Holland v. Florida*, ─── U.S. ───, 130 S. Ct. 2549, 2561 (2010)) (alteration in original).  "The triggering events are the dates on which: direct review becomes final, an unlawful state-created impediment to filing is removed, a new constitutional right is made retroactively available, or the factual predicate of the claim(s) presented could have been discovered with 'due diligence.'" *Lee*, 653 F.3d at 933 (quoting 28 U.S.C. § 2244(d)(1)(A)–(D)).

---

[5]     Petitioner has not identified the "650 pages of documents [that the State allegedly admitted during trial that it had failed to disclose] to the defense." (Doc. 1 at 23.)  It appears that Petitioner mistakenly construed post-conviction counsel's reference to the facts of the "*Chapman* case" — the Ninth Circuit's decision in *United States v. Chapman*, 524 F.3d 1073, 2008 WL 1947744 (9th Cir. 2008) — as a reference to events in his own cases.  (*Compare* Doc. 15, Ex. A, Item 150, at 9 (discussing the *Chapman* case) and Doc. 15, Ex. C, Item 124, at 9 (same), *with Chapman*, 524 F.3d at 077 ("The district court dismissed an indictment against . . .[]Defendants[] after the prosecution admitted that it had failed to meet its obligations to disclose over 650 pages of documents to the defense.").  Therefore, this claim is not properly presented to this Court.

1    The one-year statute of limitations begins running on the latest of those dates.  *See* 28

2    U.S.C. § 2244(d)(1); *Hasan v. Galaza*, 254 F.3d 1150, 1153 (9th Cir. 2001).

3         When a § 2254 petition advances multiple grounds for habeas corpus relief, the

4    "AEDPA's one-year statute of limitations in § 2244(d)(1) applies to each claim in a

5    habeas application on an individual basis." *Mardesich v. Cate*, 668 F.3d 1164, 1171 (9th

6    Cir. 2012).  Accordingly, the Court considers the limitations period as it applies to each

7    of Petitioner's claims.[6]

8                    **1.    Claims Related to the Dunbar Case**

9         Grounds Four and Five of the Petition relate to Petitioner's conviction in the

10   Dunbar case.  Petitioner asserts that (1) he received a disproportionate sentence because

11   the trial court was biased against him (Ground Four)[7]; and (2) the trial court erred by

12   failing to instruct the jury on Petitioner's alibi defense (Ground Five).  As Respondents

13   argue, Petitioner did not file the pending § 2254 petition until after the AEDPA's one-

14   year statute of limitations expired as to these claims.  (Doc. 15 at 45.)

15        On March 20, 2008, the Arizona Court of Appeals affirmed Petitioner's conviction

16   and sentence in the Dunbar case.  (Doc. 15, Ex. FF.)  Rule 31.19(a) of the Arizona Rules

17   of Criminal Procedure provides that "[w]ithin 30 days after the Court of Appeals issues

18   its decision, any party may file a petition for review with the clerk of [Arizona] Supreme

19   Court."  Ariz. R. Crim. P. 31.19(a).  Rule 1.3(a) of the Arizona Rules of Criminal

20   Procedure extends that deadline by five days when the notice of determination is mailed

21   by the clerk.  *See State v. Goracke*, 106 P.3d 1035, 1036 n.1 (Ariz. Ct. App. 2005)

22

23   _____

24        [6]   In general, the court can consider the timeliness of the claims asserted in a
     habeas corpus petition collectively because most often a petitioner's claims arise from a
25   single trial and the triggering event for the statute of limitations is the finality of the
     conviction under § 2244(d)(1)(A).  Thus, the statute of limitations starts running on the
26   same date for the petitioner's claims.  However, when a petitioner challenges convictions
     that became final on different dates or raises claims that implicate the triggering events in
27   28 U.S.C. § 2244(d)(1)(B)–(D), the statute of limitations may begin on different dates for
     each claim.

28        [7]   Petitioner's sentencing claim in Ground Four also pertains to the Connolly case.
     The Court discusses Ground Four as it pertains to the Connolly case in Section II.A.3.

                                    - 19 -

1   (discussing Rule 1.3(a)).   Thus, under Rules 31.19(a) and 1.3(a), Petitioner had until

2   April 24, 2008 to file a petition for review in the Arizona Supreme Court.

3        The record reflects that Petitioner did not file a petition for review with the

4   Arizona Supreme Court on or before the April 24, 2008 deadline.  (Doc. 15, Ex. C, Item

5   116.)   Thus, Petitioner's judgment of conviction in the Dunbar case became final for

6   purposes of 28 U.S.C. § 2244(d)(1)(A) on April 24, 2008, the date the time for seeking

7   discretionary review in the Arizona Supreme Court expired.  *See Gonzalez v. Thaler*, __

8   U.S.___, 132 S. Ct. 641, 646 (2012) ("We hold that, for a state prisoner who does not

9   seek review in a State's highest court, the judgment becomes 'final' on the date that the

10  time for seeking such review expires."); *Camacho v. Hobbs*, 774 F.3d 931, 933-34 (8th

11  Cir. 2015) ("noting that the Supreme Court in *Gonzalez* "instructed us that when a

12  petitioner decides to forgo state-court appeals, we must 'look to state-court filing

13  deadlines to determine the 'expiration of the time for seeking [direct] review'''");

14  *McMonagle v. Meyer*, 766 F.3d 1151 (9th Cir. 2014) (same).

15       The statute of limitations on Grounds Four and Five, to the extent that they allege

16  judicial bias and instructional error in the Dunbar case, began running on April 24, 2008,

17  the date on which Petitioner's conviction became final on direct review under

18  § 2244(d)(1)(A), because these claims do not implicate any of the other triggering dates

19  for the statute of limitations.  *See* § 2244(d)(1)(B)–(D).

20                    **2.        Statutory Tolling related to Dunbar Case Claims**

21       Pursuant to the AEDPA, the one-year limitations period is tolled during the time

22  that a "properly filed application for State post-conviction or other collateral review with

23  respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2); *see Nino*

24  *v. Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999) (stating that an application for collateral

25  review is pending in State court for "all the time during which a state prisoner is

26  attempting, through proper use of state court procedures, to exhaust state remedies with

27  regard to particular post-conviction proceedings.").

28

The limitations period for Petitioner's claims related to the Dunbar case, asserted in Grounds Four and Five, commenced on April 24, 2008 and ran until Thursday, June 27, 2008, when Petitioner filed a pro per notice of post-conviction relief related to the Dunbar case.[8]   (Doc. 15, Ex. C, Item 117.)  *See Isley v. Ariz. Dep't of Corrs.*, 383 F.3d 1054, 1055-56 (9th Cir. 2004) (stating that in Arizona, a state post-conviction proceeding is commenced when the petitioner files the notice in accordance with Rule 32.4(a)). Thus, the 365-day limitations period ran for sixty-four days before it was tolled.  *See Nino v. Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999) (the "AEDPA's statute of limitations is not tolled from the time a final decision is issued on direct state appeal and the time the first collateral challenge is filed because there is no case 'pending' during that interval.").  The limitations period remained tolled until April 29, 2013, when the Arizona Supreme Court denied review of the trial court's denial of post-conviction relief. (Doc. 15, Ex. D, Item 142; Exs. KK, Ex. OO.)

On July 26, 2013, Petitioner filed a petition for writ of certiorari in the United States Supreme Court, which was denied on October 15, 2013.  (Doc. 15, Ex. QQ.)  The limitations period was not tolled during that time because a petition for writ of certiorari to the United States Supreme Court is not an application for state collateral review under § 2244(d)(2).  *See Lawrence v. Florida*, 549 U.S. 327, 332 (2007) ("The application for state post-conviction review is therefore not 'pending' after the state court's post-conviction review is complete, and § 2244(d)(2) does not toll the 1–year limitations period during the pendency of a petition for certiorari."); *White v. Klitzkie*, 281 F.3d 920, 924 (9th Cir. 2002) ("A petition for a writ of certiorari to the United States Supreme Court is simply not an application for state review [under Section 2244(d)(2)].") (collecting pre-*Lawrence* cases).

Accordingly, the statute of limitations, which had 301 days remaining, began running again on April 29, 2013.  Thus, February 24, 2014 was the deadline for Petitioner

---

[8]   The post-conviction proceedings in the Dunbar and Connolly cases were consolidated after Petitioner's counsel filed a consolidated petition for review.  (Doc. 15, Ex. A, Item 150; Ex. B, Item 164; Ex. C, Item 124.; Ex. D, Item 142.)

1   to file a § 2254 petition seeking federal habeas corpus relief on the claims related to the

2   Dunbar case that are asserted in Grounds Four and Five.[9]

3       After the February 24, 2014 deadline passed, on May 23, 2014, Petitioner, through

4   counsel, commenced a second consolidated post-conviction proceeding in state court.

5   (Doc. 15, Exs. RR, SS); *See* Section I.E n.3 (discussing the commencement of the second

6   post-conviction proceeding).  Because the AEDPA statute of limitations as to Grounds

7   Four and Five had expired by the time Petitioner commenced that proceeding, it did not

8   toll the limitations period.  *See Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003)

9   (holding that "section 2244(d) does not permit re-initiation of the limitations period that

10  has ended before the state petition was filed.").

11      As previously stated, the deadline for Petitioner to file a § 2254 petition raising the

12  claims related to the Dunbar case asserted in Grounds Four and Five, was February 24,

13  2014.  Applying the mailbox rule, *see* Section I.E. n.4, Petitioner did file his Petition until

14  October 9, 2014, more than two-hundred days after the limitations period expired on the

15  Dunbar case claims raised in Grounds Four and Five.   Accordingly, the Petition is

16  untimely as those claims unless Petitioner establishes that equitable tolling or an

17  exception to the statute of limitations applies.   The Court discusses equitable tolling in

18  Section II.B.

19              **3.       Claims Related to the Connolly Case**

20      The following four claims in the Petition relate to the Connolly case: (1) trial

21  counsel was ineffective as alleged in Ground One (a) through One (f); (2) the prosecutor

22  committed prosecutorial misconduct as alleged in Ground Two (a) through (c); (3) the

23  State violated its obligations to disclose *Brady* material, as alleged in Ground Three (a)

24  and (b); and (4) Petitioner received a disproportionate sentence because the trial court

_____

27  [9]  Respondents state that the deadline was February 19, 2014.  (Doc. 15 at 49.)  It
28  appears that Respondents miscalculated 301 days after April 29, 2013.  However, that
    error does not impact Respondents' analysis because the Petition is untimely whether it
    was due on February 19 or 24, 2014.

1    was biased against him (Ground Four).[10]   Respondents argue that these claims were not

2    timely presented for federal habeas corpus review.  (Doc. 15 at 50.)

3            The Arizona Court of Appeals affirmed Petitioner's conviction and sentence in the

4    Connolly case on December 20, 2007.  (Doc. 15, Ex. R.)  Petitioner filed a petition for

5    review with the Arizona Supreme Court, which was denied on June 3, 2008.  (Doc. 15,

6    Exs S, T.)  Petitioner then had ninety days, until Monday, September 2, 2008, to file a

7    petition for writ of certiorari with the Supreme Court.[11]   See Sup. Ct. R. 13.1 (a petition

8    for writ of certiorari to review a judgment entered by a state's highest court must be filed

9    in the United States Supreme Court with ninety days after entry of the judgment).

10   Petitioner did not file a petition for writ of certiorari.  See Bowen v. Roe, 188 F.3d 1157,

11   1158-59 (9th Cir. 1999) ("the period of direct review in 28 U.S.C. § 2244(d)(1)(A)

12   includes the period within which a petitioner can file a petition for writ of certiorari from

13   the United States Supreme Court, whether or not the petitioner actually files such a

14   petition.").

15          Accordingly, the statute of limitations on Ground Four (sentencing bias in the

16   Connolly case), began running on September 2, 2008, the date on which Petitioner's

17   conviction in the Connolly became final on direct review under § 2244(d)(1)(A), because

18   that claim does not implicate any of the other triggering dates for the statute of

19   limitations.  See § 2244 (d)(1)(B)–(D).

20          The statute of limitations also began running on September 2, 2008 for the claims

21   of ineffective assistance of trial counsel in the Connolly case asserted in Ground One (a)

22   – (f), to the extent those claims involve witnesses other than Connolly, because those

---

26   [10]   As previously stated, Ground Four also pertains to the Dunbar case.  See Section II.A.1

27   [11]   Ninety days after Tuesday June 3, 2008 is Monday September 1, 2008.
28   However, that date was Labor Day, the next business day was Tuesday, September 2, 2008.  See Sup. Ct. R. 30 (governing computation and extension of time).

claims do not implicate any of the other triggering dates for the statute of limitations set forth in § 2244 (d)(1)(B)–(D).[12]

To the extent that Petitioner's claims in Grounds One (a), (c), (d), and (e), Grounds Two (a), (b), and (c), and Ground Three (a) pertain to Connolly's statements, Petitioner may argue that the statute of limitations on those claims did not begin to run until he was aware of the statements in Connolly's affidavit.  Petitioner submitted Connolly's affidavit as an exhibit to his first petition for post-conviction relief (which was prepared by counsel).  Thus, "through the exercise of due diligence," Petitioner could have discovered the factual basis for his claims relating to Connolly — the ineffective assistance claims in Ground One (a), (c), (d), and (e), the prosecutorial-misconduct claims in Ground Two (a), (b), and (c), and the *Brady* claim in Ground Three (a) — no later than March 23, 2009, the date on which Connolly executed her affidavit before a notary public.  (Doc. 15, Ex. A, Items 150 at 10-11 and Attachment 1; Ex. C, Item 124 at 10-11 and Attachment 1); *see* 28 U.S.C. § 2244(d)(1)(D).  Thus, the statute of limitations began running on March 23, 2009 as to those claims.

### 4.    Statutory Tolling related to Connolly Case Claims

As stated above in Section II.A.3, the limitations period began running on the Petitioner's claims related to the Connolly case either on September 2, 2008 or March 23, 2009.  However, the limitations period was immediately tolled as to all of those claims because Petitioner had previously filed a notice of post-conviction relief related to the Connolly case on July 11, 2008.   (Doc. 15, Ex. A, Item 123.)   The post-conviction proceeding was later consolidated with the post-conviction action in the Dunbar case.  As discussed in Section II.A.2, the consolidated post-conviction proceeding remained pending, and tolled the limitations period, until April 29, 2013 when the Arizona

---

[12]   In Ground One (a) – (f), Petitioner asserted that (1) counsel did not "receive full discovery of what the prosecution had," (Ground One (a)); (2) counsel did not "meet with the prosecutor and go over all evidence, good and bad, in the case" (Ground One (b)); (3) counsel did not depose "all parties concern[ed]" (Ground One (c)); (4) counsel did not "locate all witnesses, state or independent" (Ground One (d)); (5) counsel did not "do an interview with each and every party" (Ground One (e)); and (6) counsel did not meet with Petitioner before trial (Ground One (f)).  (Doc. 1-1 at 18-19.)

Supreme Court summarily denied review of the trial court's denial of post-conviction relief.  (Doc. 15, Ex. D, Item 142; Ex. KK; Ex. OO.)

On July 26, 2013, Petitioner filed a petition for writ of certiorari in the United States Supreme Court, which was denied on October 15, 2013.  (Doc. 15, Ex. QQ.)  The limitations period was not tolled during that time because a petition for writ of certiorari to the United States Supreme Court is not an application for state collateral review under § 2244(d)(2).  *See Lawrence*, 549 U.S. at 332.

Accordingly, the deadline for Petitioner to file a habeas corpus petition raising the claims pertaining to the Connolly case was April 29, 2014.  *See United States v. Hurst*, 322 F.3d 1256, 1261 (10th Cir. 2003) ("A motion presented to the court on the anniversary date of a triggering event is within the '1-year period of limitation' set out in § 2255 and § 2244(d)(1)."); *Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) (applying Rule 6(a) of the Federal Rules of Civil Procedure to § 2254 cases and concluding that April 24, 1997 would be the expiration date of the 1-year limitations period for state prisoners whose convictions became final before the AEDPA's effective date, April 24, 1996).  As previously stated in Section I.E. n.4, under the mailbox rule, the pending Petition is considered filed on October 9, 2014, which is more than one-hundred days after the AEDPA's limitations period expired as to the claims that pertain to the Connolly case.

After the April 29, 2014 deadline passed, on May 23, 2014, Petitioner, through counsel, commenced a second consolidated post-conviction proceeding in state court.  (Doc. 15, Exs. RR, SS); *see* Section I.E n.3 (discussing the commencement of the second post-conviction proceeding).  Because the AEDPA statute of limitations as to the claims related to the Connolly case had expired by the time Petitioner commenced that proceeding, it did not toll the limitations period.  *See Ferguson*, 321 F.3d at 823.  Accordingly, the Petition is untimely as to the claims related to the Connolly case unless Petitioner establishes that equitable tolling or an exception to the limitations period applies.

**B.      Equitable Tolling or Exception to the Limitations Period**

Because Petitioner filed the pending Petition after the statute of limitations expired as to all of his claims, the Petition is not subject to federal habeas corpus review unless Petitioner establishes a basis for equitably tolling or avoiding the limitations period.

## 1.      Equitable Tolling

The AEDPA limitations period may be equitably tolled because it is a statute of limitations, not a jurisdictional bar.  *Holland v. Florida*, 560 U.S. 631, 645 (2010).  However, a petitioner is entitled to equitable tolling only if he shows: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005).  "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence."  *Holland*, 560 U.S. at 653 (internal citations and quotations omitted).  Whether to apply the doctrine of equitable tolling "'is highly fact-dependent,' and [the petitioner] 'bears the burden of showing that equitable tolling is appropriate.'"  *Espinoza-Matthews v. California*, 432 F.3d 1021, 1026 (9th Cir. 2005) (internal citations omitted).

Petitioner does not argue that equitable tolling applies.   (Docs. 1, 24.)  Additionally, the record does not reveal any extraordinary circumstance that prevented Petitioner from filing a timely federal habeas corpus petition.   Petitioner's lack of familiarity with the law and lack of legal assistance do not constitute extraordinary circumstances sufficient to toll the limitations period.  *See Ballesteros v. Schriro*, 2007 WL 666927, at *5 (D. Ariz. Feb. 26, 2007) (a petitioner's pro se status, ignorance of the law, lack of representation during the applicable filing period, and temporary incapacity do not constitute extraordinary circumstances).

## 2.      Actual Innocence Exception

Liberally construing the Petition, to avoid the statute of limitations, Petitioner argues that he is actually innocent based on the statements in Connolly's affidavit.

(Doc. 24 at 3-4.)   As set forth below, Petitioner has not established a claim of actual innocence that constitutes an equitable exception to the one-year statute of limitations.

In *McQuiggin v. Perkins*, ___ U.S. ___, 133 S. Ct. 1924, (2013), the United States Supreme Court recognized an exception to the AEDPA statute of limitations for a claim of actual innocence.   The Court adopted the actual innocence gateway previously recognized in *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995), for excusing the bar to federal habeas corpus review of procedurally defaulted claims.  *McQuiggin*, 133 S. Ct. at 1928 (citing *Schlup*, 513 U.S. at 937-38.)

The rule announced in *McQuiggin* does not provide for an extension of the time statutorily prescribed, but instead is an equitable exception to § 2244(d)(1).  *McQuiggin*, 133 S. Ct. at 1931.  Actual innocence, if proven, merely allows a federal court to address the merits of a petitioner's otherwise time-barred constitutional claims; the Supreme Court has not yet addressed whether "a freestanding claim of actual innocence" provides a separate basis for granting habeas relief.  *Id.*

To pass through the *Schlup* gateway, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."   *Schlup*, 513 U.S. at 316.   *Schlup* requires a petitioner 'to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial.'"  *Lee*, 653 F.3d at 938 (quoting *Schlup*, 513 U.S. at 324). "'To be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial," *Calderon v Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324), although "the habeas court's analysis is not limited to such evidence." *House v. Bell*, 547 U.S. 518, 537 (2006).  "*Schlup* pointed out three types of evidence that would pass the threshold of reliability: exculpatory scientific evidence, trustworthy eyewitness accounts and critical physical evidence."  *Lee*, 653 F.3d at 945 (Kozinski, J., concurring) (citing *Schlup*, 513 U.S. at 324-28).  Actual innocence claims may not rest upon evidence that was available but not presented at trial.  *See Hubbard v. Pinchak*, 378

F.3d 333, 340 (3rd Cir. 2004) ("The only evidence that Hubbard asserts is 'new' is what he terms as 'his own sworn testimony . . . .  A defendant's own late-proffered testimony is not 'new' because it was available at trial.").

Here, Petitioner argues that he is actually innocent of the convictions in the Dunbar and Connolly cases based on the statements in Connolly's affidavit.  (Doc. 24 at 3-4.)   As discussed below, the assertions in Connolly's affidavit are insufficient to establish that "it is more likely than not that no reasonable juror would have convicted [Petitioner] in the light of [that evidence.]"  *Schlup*, 513 U.S. at 316.

**a.    The Connolly Case**

Regarding the Connolly case, Connolly's affidavit states that:

> 5.    The [s]tatements introduced at trial by Physician Assistant Figueroa are inaccurate.  When I arrived at the hospital, Detective Hampton and P.A. Figueroa worked together in trying to make me state that [Petitioner] assaulted me.  Detective Hampton told P.A. Figueroa that I was assaulted and that she needed P.A. Figueroa's assistance in filing charges on the case.
>
> 6.    I never told Mr. Figueroa that "my husband punched, kicked, and hit me."  I never said that to the physician assistant.  Had I not been prevented from testifying in this case, I would have explained that the testimony was inaccurate.

(Doc. 15, Ex. A, Item 150, Attachment 1; Ex, C, Item 124, Attachment 1.)

If Connolly offered this testimony at trial, a reasonable juror could have resolved the conflicts in the evidence against Petitioner for the following reasons.  First, Connolly had prior felony convictions that detracted from her credibility, but there was no evidence that Physician Assistant Figueroa or Detective Hampton had a criminal history.  (Doc. 15, Ex. E, TR 3/27/06 at 55.)   Second, if Connolly testified that someone other than Petitioner had assaulted her, the State would have been allowed to offer evidence of Connolly's statement to Figueroa at that hospital that "she [had been] punched multiple times by her husband in the head, face, and chest."[13]  (Doc. 15, Ex. K, TR 4/12/06 at 4-6,

---

[13]   Connolly was unavailable to testify at trial and, therefore, was not subject to cross-examination.  Accordingly, the trial court ordered Figueroa not to name Petitioner as Connolly's reported assailant when relating her emergency-room statement to the jury, and directed Figueroa to testify that Connolly told him, "I was hit in the nose, face, and chest."  (Doc. 15, Ex. K, TR 4/12/06 at 124-25.)

124-28.)  *See* Ariz. R. Evid. 801(d)(1)(A) (hearsay exception for out-of-court statements that are "inconsistent with the declarant's testimony"); *State v. Mills*, 995 P.2d 705, 710 (Ariz. Ct. App. 1999) ("The jury may consider prior inconsistent statements as impeachment and as substantive evidence.").  Third, Connolly's post-trial statements in her affidavit carry little weight because recanted testimony is considered inherently unreliable.  *See Jones v. Taylor*, 763 F.3d 1242, 1248-51 (9th Cir. 2014) (recantation testimony of molestation victim and relatives did not establish the petitioner's actual innocence, considering their suspect motives, their delay in coming forward, their prior statements, and other evidence of guilt) (collecting cases).

Additionally, during trial the State presented evidence that Petitioner was Connolly's assailant, including: (1) the testimony of two neighbors — Dunbar and Bramley — who overheard Petitioner and Connolly argue and saw Petitioner run from their apartment immediately afterwards; (2) the testimony of the first two responding police officers who stated that they followed a trail of blood to Petitioner and Connolly's apartment where they found Connolly crying and bleeding; and (3) photographs of Connolly's injuries and blood on the floor of Connolly's and Petitioner's apartment.  (*See* Section I.A.1.)

Although Connolly's version of events contained in her affidavit would have conflicted with the State's trial evidence, that conflict is insufficient to establish that "it is more likely than not that no reasonable juror would have convicted [Petitioner] in the light of the new evidence."  *Schlup*, 513 U.S. at 316.  It is not enough that the new evidence show the existence of reasonable doubt.  *Id.* at 329.

In short, even if Connolly presented testimony consistent with the statements in her affidavit, while that testimony may create some doubt about Petitioner's guilt, that evidence does not meet *Schlup's* exacting standard that, in light of the newly discovered

evidence, it is more likely than not that no reasonable juror would have convicted Petitioner.[14]  *Schlup*, 513 U.S. at 316.

Accordingly, the actual innocence exception to the AEDPA limitations period does not apply to Petitioner's claims related to the Connolly case.  As emphasized in *Schlup*, the "actual innocence exception remains only a safety valve for the extraordinary case."  *Schlup*, 513 U.S. at 333 (O'Connor, J., concurring) (internal quotation marks omitted).  Petitioner has not established that standard.  Because Petitioner has not established a basis to avoid the statute of limitations pertaining to his claims in the Connolly case his assertion of those claims is untimely and his request for relief on those claims should be denied on that basis.

### b.    The Dunbar Case

As discussed below, Petitioner also fails to establish that "it is more likely than not that no reasonable juror would have convicted [Petitioner in the Dunbar case] in the light of [Connolly's statements in her affidavit]."  *Schlup*, 513 U.S. at 316.  Connolly's affidavit contains the following statements related to the Dunbar case:

> 21.    Mr. Dunbar attacked me on September 16, 2005, and my friend and neighbor "Tony" Anton Kopwasky came to my aid.

> 22.    Mr. Dunbar had shut off my electrical box and placed a lock on it.  When I went to resolve the issue, Mr. Dunbar [Dunbar] screamed at me and pushed me down.

> 23.    Mr. Dunbar and Mr. Anton began fighting and Tony knocked Mr. Dunbar unconscious.  Mr. Kowasky left the scene.  [Petitioner] was not present and was residing in California when the incident occurred.

(Doc. 15, Ex. A, Item 150, Attachment 1; Ex. C, Item 124, Attachment 1.)

The statements in Connolly's affidavit do not satisfy *Schlup's* high standard.  First, although Connolly did not testify at the Dunbar trial, Petitioner presented her version of

---

[14]  In other cases when it was determined that a federal habeas petitioner met the *Schlup* standard, the "new evidence" consisted of credible evidence such as the petitioner's solid alibi, *see Garcia v. Portuondo*, 334 F. Supp. 2d 446, 455-56 (S.D.N.Y. 2004), numerous eyewitness accounts of the crime that exonerated the petitioner, *see Schlup v. Delo*, 912 F. Supp. 448, 451-53 (E.D. Mo.1995) (on remand), and a credible confession by a likely suspect stating that he had framed the defendant, *see Carriger v. Stewart*, 132 F.3d at 465, 471 (9th Cir. 1997).

events through the testimony of Officers Rainey and Benker.  Those officers testified that on the night of the incident, Connolly reported that Dunbar had pushed her down during an argument about a lock on the electrical breaker box, and that someone other than Petitioner — a man she claimed to be her "boyfriend" and described as a "Hispanic male" — beat Dunbar.  (Doc. 15, Ex. W, TR 5/4/06 at 105-16; Ex. X, TR 5/8/06 at 62-67, 79.)  Additionally, Petitioner called his alleged fiancée, Boone, to testify that Petitioner was in California with her and asked her to marry him on the day of the alleged incident.  (Doc. 15, Ex. X, TR 5/8/06 at 16-23, 27-30, 47.)

Based on Petitioner's conviction in the Dunbar case, the jury rejected this evidence.  The statements in Connolly's affidavit would have been cumulative to the evidence Petitioner presented to the jury through Rainey, Benker, and Boone.  *See Schlup*, 513 U.S. at 324 ("To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.").  Thus, the statements in Connolly's affidavit related to the Dunbar case are not new evidence under *Schlup*.  *See Cooper v. Brown*, 510 F.3d 870, 971 (9th Cir. 2007) ("In any event, what Petitioner claims was known at trial, and cannot serve as a basis for a claim of actual innocence."); *Bannister v. Delo*, 100 F.3d 610, 618 (8th Cir. 1996) ("Putting a different spin on evidence that was presented to the jury does not satisfy the requirements set forth in *Schlup*.").

At trial, three prosecution witnesses — the victim and two neighbors — positively identified Petitioner as the assailant.  (*See* Section I.B.1).  Although Connolly's version of events contained in her affidavit might have conflicted with the State's trial evidence, that conflict is insufficient to establish that "it is more likely than not that no reasonable juror would have convicted [Petitioner] in the light of the new evidence."  *Schlup*, 513 U.S. at 316.  It is not enough that the new evidence show the existence of reasonable doubt.  *Id.* at 329.  Even if Connolly had testified in a manner consistent with the statements in her affidavit, that evidence does not meet *Schlup's* high standard that, in

1   light of the newly discovered evidence, it is more likely than not that no reasonable juror

2   would have convicted Petitioner.  *See Schlup*, 513 U.S. at 316.

3           Accordingly, the actual innocence exception to the AEDPA limitations period

4   does not apply to Petitioner's claims related to the Dunbar case.  Because Petitioner has

5   not established a basis to avoid the statute of limitations pertaining to his claims related to

6   the Dunbar case, his assertion of those claims is untimely and his request for relief on

7   those claims should be denied on that basis.

8   **III.     Conclusion**

9           Petitioner filed the pending Petition after the AEDPA limitations period had

10  expired as to all of his claims.  Therefore, the Petition is untimely.  As set forth above,

11  Petitioner has not established a basis to avoid the statute of limitations.  Accordingly, the

12  Petition should be denied as untimely and Petitioner's request for an evidentiary hearing

13  should be denied.[15]  (Doc. 24 at 9.)  The Court does not consider Respondents' alternative

14  grounds for denying habeas corpus relief.  (Doc. 15 at 68-103.)

15          Accordingly,

16          **IT IS RECOMMENDED** that the Petition for Writ of Habeas Corpus (Doc. 1) be

17  **DENIED**.

18          **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and

19  leave to proceed in forma pauperis on appeal be **DENIED** because the dismissal of the

20  Petition is justified by a plain procedural bar and reasonable jurists would not find the

21  procedural ruling debatable and because Petitioner has not made a substantial showing of

22  the denial of a constitutional right.

23          This recommendation is not an order that is immediately appealable to the Ninth

24  Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1) of the Federal

25  Rules of Appellate Procedure should not be filed until entry of the District Court's

26  judgment.  The parties shall have fourteen days from the date of service of a copy of this

27
28          [15]  In his Reply, Petitioner requests the appointment of counsel.  (Doc. 24 at 9.)
     This request is denied for the reasons set forth in the Court's March 25, 2015 Order, in
     which the Court denied a previous request for counsel.  (Doc. 13.)

- 32 -

recommendation within which to file specific written objections with the Court.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6, 72.  The parties shall have fourteen days within which to file responses to any objections.  Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure to file timely objections to any factual determinations of the Magistrate Judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.  *See* Fed. R. Civ. P. 72.

Dated this 29th day of September, 2015.

_____
Bridget S. Bade
United States Magistrate Judge